PHILIP A. GASTEIER (State Bar No. 130043)
DAVID B. GOLUBCHIK (State Bar No. 185520)
J.P. FRITZ (State Bar No. 245240)
LEVENE, NEALE, BENDER, RANKIN & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email:  pag@lnbrb.com; dbg@lnbrb.com; jpf@lnbrb.com

Proposed Attorneys for Debtor and Debtor in Possession

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: | ) Case No.: 2:10-bk-13375-RN |
| | ) |
| REFRIGERANT EXCHANGE CORP. | ) Chapter 11 Case |
| | ) |
| Debtor and Debtor in Possession, | ) DEBTOR'S EMERGENCY MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTOR TO USE CASH COLLATERAL ON AN INTERIM BASIS PENDING A FINAL HEARING |
| | ) |
| | ) MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION IN SUPPORT THEREOF |
| | ) |
| | ) Hearing: |
| | ) Date:    February  8, 2010 |
| | ) Time:    9:00 a.m. |
| | ) Ctrm:    255 East Temple Street |
| | )             Courtroom 1645 |
| | )             Los Angeles, CA 90012 |
| | ) |

## SUMMARY

Pursuant to Local Bankruptcy Rules 2081-1(a)(9), 4001-2 and 9075-1, 11 U.S.C. §§ 363(c), 364(b) and 503(b)(1), and Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), Refrigerant Exchange Inc. (the "Debtor"), the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case, hereby moves, on an emergency basis (the "Motion"), for entry of an order authorizing the Debtor to use cash collateral on an emergency interim basis pending a final hearing in accordance with the Debtor's operating budget (the "Budget"), a copy of which is attached as Exhibit "A" to the annexed Declaration of Dennis O'Meara ("O'Meara Declaration").

Refrigerant Exchange is a leader in providing environmentally responsible solutions for refrigerant reclamation and recycling in the United States. Though incorporated in 1997, through its unique proprietary system it has pioneered the separation and purification of refrigerant material to EPA specifications since 1971. The Debtor commenced this case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on January 29, 2010.

The Debtor operates out of a processing facility located at 5263 N. 4th Street, Irwindale, California 91706, and has maintained an office and small warehouse in a leased facility located at 15709 E. Arrow Highway #4, Irwindale, California 91706. The Debtor has 7 regular employees and 3 part-time employees

The Debtor is an EPA certified refrigerant reclaimer. It accepts used and mixed refrigerant from a variety of sources, separates this mixed refrigerant back to original specifications as required by the US EPA to assist in meeting targets for reductions in use of hydrochloroflourocarbons ("HCFCs") set by the Montreal Protocol. (The Montreal Protocol is a successful international treaty first released for signing in 1987, for the purpose of combating loss in the ozone layer protecting the Earth from harmful ultraviolet rays.)

A principal part of the Debtor's recent business plan has been to accumulate as much volume in HCFCs as possible, primarily of the type known as "R-22 refrigerant," in order to take advantage of anticipated price increases resulting from new EPA restrictions imposed as of January 1, 2010. The Debtor has accumulated nearly 2,000,000 pounds of used and mixed R-22

refrigerant and has already seen the pricing of R-22 go from about $1.00 a pound in late 2008 to nearly $4.00 per pound on a wholesale basis, with anticipated increases to as much as $10 to $12 per pound by this summer subject to weather and economic conditions in the country. The Debtor has been preparing for this unique "Perfect Storm" of demand and pricing for a long time by purposely keeping sales at a reduced rate while accumulating this material.

In addition, as of February 3, 2010, the Debtor anticipates that it will have the ability to receive substantial additional income from sale of carbon credits. The Debtor has over 100,000 pounds of CFC types of refrigerant in its inventory, which it can incinerate and potentially generate over 475,000 metric tons of carbon credits this year. This would enhance its income by over $3,000,000 this year alone.

Unfortunately, the Debtor's financial situation did not permit it to maintain all payments until it could fully implement and realize the benefits of its business plan. The Debtor has been expanding production capacity in order to take advantage of the above opportunities. Among other things, this required expansion of electrical facilities. Because of the heavy regulatory environment of California and Southern California Edison this took over two years to complete.

The Debtor was able to obtain improved financing, but in that process was left with a second trust deed at high interest. The terrible financing climate of the last 14 months would not allow it to refinance the second trust deed without causing severe economic cost to the firm. The Debtor was required to seek bankruptcy protection in order to avoid foreclosure on its processing facility by the holder of the second trust deed.

The Debtor's operations were primarily financed by Pacific Mercantile Bank ("PMB"), which asserts a first priority security interest in substantially all of the Debtor's assets to secure an obligation of approximately $1.3 million. PCB's claim is also secured by a first deed of trust on the Debtor's interest in the real property on which its processing facility is located. That facility is also subject to a second deed of trust securing an amount asserted to be up to $175,000, and a third deed of trust securing an amount of $60,000. In addition, the Debtor has recently been subject to two filed tax liens, one by the State of California, Franchise Tax Board in the amount of $2,526, and the second by the State of California, Employment Development

1    Department is an undetermined amount believed to be approximately $2,800.

2         The Debtor's assets, which serve as collateral for the foregoing secured claims, are

3    valued at approximately $3,581,000 based on appraised value of the real estate at $1,250,000;

4    and book value of inventory at $1,443,500, accounts receivable of $227,000, and furnishings,

5    fixtures and equipment of $660,550.  However, for reasons discussed below, the Debtor believes

6    that the value of the Debtor's inventory and business as a going concern is actually substantially

7    higher.

8         Notwithstanding the past financial difficulties, the Debtor is now in position where the R-

9    22 refrigerant will start to take dramatic hikes in pricing, allowing the Debtor to generate a very

10   comfortable cash flow from the business.  The Budget attached hereto as Exhibit "A" is a cash

11   budget for the four months of February through May.  The sale of carbon credits will

12   significantly enhance revenues.

13        The Debtor submits that creditors asserting a security interest in cash collateral will be

14   adequately protected in connection with the use of cash collateral.  The secured creditors are

15   protected by an equity cushion of over 50%.  In addition to the foregoing, the secured

16   creditors will be adequately protected by the continuing management and operation of the

17   business and property, thereby preserving the value of their collateral.  Finally, the Debtor

18   proposes to grant to the secured creditors a replacement lien with the same extent, validity and

19   priority as the secured creditor was entitled to on the date of the bankruptcy filing, to secure

20   any diminution in the value of their collateral resulting from the Debtor's use of cash

21   collateral.

22        The Debtor believes that the secured creditors will consent to use of cash collateral.

23   However, in an overabundance of caution, and based on the fact that the Debtor has an

24   immediate need for use of cash collateral for business operations, the Debtor determined that

25   the filing of this Motion was necessary and proper.  The Debtor anticipates that a formal cash

26   collateral stipulation will be entered into prior to the final cash collateral hearing.

27   ///

28   ///

## ADDITIONAL INFORMATION

Pursuant to L.B.R. 2081-1(c), the Debtor submits that its proposed order authorizing the Debtor's use of cash collateral on an interim basis pending a final hearing will not contain the following provisions:

| Provision | Paragraph |
|---|---|
| Cross-collateralization clauses | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's pre-petition lien or debt or the waiver of claims against the secured creditor. | No |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's pre-petition lien. | No |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable provision of law. | No |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds. | No |
| Releases of liability for the creditor's alleged prepetition torts or breaches of Contract. | No |
| Waivers of avoidance actions arising under the Bankruptcy Code. | No |
| Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt | No |
| Provisions that provide disparate treatment for the professionals retained by a creditors' committee from that provided for the professionals retained by the debtor with respect to a professional fee carve out | No |
| Provisions that prime any secured lien | No |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee. | No |
| | |

| Provision | Paragraph |
|---|---|
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens. | No |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548 and 549. | No |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | No |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order. | No |
| Provisions providing for the paying down of prepetition principal owed to a creditor. | No |
| Findings of fact on matters extraneous to the approval process. | No |

This Motion is based on the Motion, the attached Memorandum of Points and Authorities and O'Meara Declaration, the statements, arguments and representations of counsel to be made at the hearing on the Motion, if any, and any other admissible evidence properly presented to the Court.

In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtor served by overnight mail a copy of this Motion and all supportive papers (including notice of the hearing) upon the Office of the United States Trustee, all creditors known to assert a security interest in cash collateral, the Debtor's 20 largest unsecured creditors, and all of those parties who have requested special notice.

WHEREFORE, the Debtor respectfully requests that this Court enter an order:

(a)     affirming the adequacy of the notice given;

(b)     authorizing the Debtor to use cash collateral pursuant to the terms of the Budget and this Motion on an interim basis pending a final hearing on the Motion;

(c)     setting a final hearing to consider approval of the Motion; and

1        (d)    granting such other and further relief as the Court deems just and proper.

2    Dated: February 3, 2010            REFRIGERANT EXCHANGE CORP.

3

4               By: ___/s/ Philip A. Gasteier___
               PHILIP A. GASTEIER

5                   DAVID B. GOLUBCHIK
               J.P. FRITZ

6                   LEVENE, NEALE, BENDER, RANKIN
                 & BRILL L.L.P.

7                   Proposed Attorneys for Debtor and

8                   Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### STATEMENT OF FACTS

In the interest of avoiding unnecessary repetition, the Debtor refers to the attached Declaration of Dennis O'Meara for a statement of relevant facts.

### II.

### DISCUSSION

A.    Requested Relief.

By way of this Motion, the Debtor respectfully requests that the Court enter an order authorizing the Debtor to use Cash Collateral pursuant to the Budget attached to the O'Meara Declaration as Exhibit "A" on an interim basis pending a final hearing, except that the Debtor seeks Court authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15%, measured at the end of the period, to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed the Debtor's budgeted expenses by a negligible amount.  Moreover, if actual expenditures for any line items during a particular period are less than in the Budget, the difference shall carryover to the following period.

B.    The Debtor Should Be Authorized To Use Cash Collateral To Operate, Maintain and Preserve its Business.

The Debtor's use of property of the estate is governed by Section 363 of the Bankruptcy Code.  Section 363(c)(l) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. §363(c)(l).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  <u>See</u> 11 U.S.C. §1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest. . . ."  11 U.S.C. §363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(l) if:

> (A)    each entity that has an interest in such cash collateral consents; or
> (B)    the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

<u>See</u> 11 U. S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property.  11 U.S.C. § 363(c)(2)(B); <u>In re Oak Glen R-Vee</u>, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); <u>In re Tucson Industrial Partners</u>, 129 B.R. 614 (9th Cir. BAP 1991).  In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business."  <u>In re Dynaco Corporation</u>, 162 B.R. 389 (Bankr. D.N.H. 1993), <u>quoting</u> <u>In re Stein</u>, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

The only source of revenue available to the Debtor to use to operate its business is the revenue generated from its business operations, including collection of its accounts receivable. As a result, the Debtor has no ability to continue to operate its business and maintain the going concern value of its business unless the Debtor has immediate access to and use of its Cash Collateral to pay the Debtor's ordinary operating expenses, including, but not limited to, payroll, rent, utilities, etc.  The expenses which the Debtor must be able to pay are set forth in the Budget.  The Debtor's inability to pay those expenses would cause immediate and

1    irreparable harm to the Debtor and its business.  The inability of the Debtor to use its Cash

2    Collateral would likely result in the immediate closure of the Debtor's operations and

3    liquidation of the Debtor's assets, to the detriment of all of the Debtor's creditors.  Therefore,

4    the Debtor should be authorized to use cash collateral to operate, maintain and preserve its

5    business.

6    C.    THE SECURED CREDITORS WILL BE ADEQUATELY PROTECTED BY THE

7          DEBTOR'S CONTINUED USE OF CASH COLLATERAL.

8         To the extent that an entity has a valid security interest in the revenues generated by

9    property, those revenues constitute "cash collateral" under Section 363(a) of the Bankruptcy

10   Code.  Pursuant to Section 363(c) (2), the Court may authorize the debtor to use a secured

11   creditor's cash collateral if the secured creditor is adequately protected.  In re Mellor, 734

12   F.2d 1396, 1400 (9th Cir. 1984).  See also In re O'Connor, 808 F.2d 1393, 1398 (10th Cir.

13   1987); In re McCombs Properties VI, Ltd., 88 B.R. 261, 265 (Bankr. C.D. Cal. l988).

14        Pursuant to the Supreme Court case of United Savings Association v. Timbers of

15   Inwood Forest Associates, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property

16   interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) of the

17   Bankruptcy Code is only the value of the lien that secures the creditor's claim.  108 S.Ct. at

18   630.  See also McCombs, at 266.  Section 506(a) "limit[s] the secured status of a creditor (i.e.,

19   the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of

20   the collateral."  McCombs, at 266.

21        The Ninth Circuit made clear in Mellor, at 1401, that in the case of an oversecured

22   creditor, an equity cushion of 20% is considered clear adequate protection of a secured

23   creditor's interest in cash collateral.  See also In re McGowan, 6 B.R. 241, 243 (Bankr. E.D.

24   Pa.1980) [holding a 10% cushion is sufficient to be adequate protection]; In re Rogers

25   Development Corp., 2 B.R. 679, 685 (Bankr. E.D. Va.1980) [court decided that an equity

26   cushion of approximately 15% to 20% was sufficient adequate protection to the creditor, even

27   though the debtors had no equity in the property.]

28

1    The Debtor believes that Pacific Mercantile Bank and the tax lien claimants are the

2    only entities that have an interest in the Debtor's cash collateral.  In this case, there cannot be

3    any serious question as to whether the secured creditors are oversecured by huge equity

4    cushions and adequately protected, based on the aggregate of assets of the Debtor, totaling in

5    excess of $3.5 million.

6    A review of the Budget shows that below the cash flow projections, the Debtor has

7    included a collateral base analysis.  Based on such data, secured creditors will be protected by

8    equity cushion of over 50%, well within the Mellor standard.

9    Moreover, the law is also clear that the preservation of the value of a secured

10    creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor

11    seeks to use cash collateral.  In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988); see also In re

12    Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).

13    Additionally, in determining adequate protection, Courts have stressed the importance

14    of promoting a debtor's reorganization.  In In re O'Connor, the Tenth Circuit stated:

15    
16    
17    
18    In this case, Debtors, in the midst of a Chapter 11 proceeding, have
proposed to deal with cash collateral for the purpose of enhancing
the prospects of reorganization.  This quest is the ultimate goal of
Chapter 11.   Hence, the Debtors' efforts are not only to be
encouraged, but also their efforts during the administration of the
proceeding are to be measured in light of that quest.  Because the
ultimate benefit to be achieved by a successful reorganization

19    inures to all the creditors of the estate, a fair opportunity must be
given to the Debtors to achieve that end.  Thus, while interests of

20    the secured creditor whose property rights are of concern to the

21    court, the interests of all other creditors also have bearing upon the

22    question of whether use of cash collateral shall be permitted during
the early stages of administration.

23    
24    In re O'Connor, 808 F.2d at 1937.

25    Further, other courts have determined that a debtor's continued business operations

26    can constitute the adequate protection of a secured creditor.  See, Matter of Pursuit Athletic

27    Footwear, Inc., 193 B.R. 713 (Bankr. D. Del. 1996); In re Newark Airport/Hotel Ltd.

28    Partnership, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); In re Dynaco, 162 B.R. 389, 394-5

1  (Bankr. D.N.H. 1993); <u>In re Immenhausen Corp.</u>, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

2  Here, there is no dispute that the Debtor is operating its business as a debtor in possession

3  pursuant to section 1107, et seq. of the United States Bankruptcy Code.

4       Accordingly, secured creditors are adequately protected by equity cushions in excess

5  of 50%.  The alternative (i.e., liquidation) will significantly impact the value of the Debtor's

6  assets and business and will prejudice the prospects of unsecured creditors.  Use of cash

7  collateral to allow the business to operate as a going concern is in the best interest of the

8  Debtor, the secured creditors and all other creditors of this estate.

9       In addition to the equity cushion that exists in the secured creditor's favor, as

10  additional adequate protection, the Debtor proposes to provide the secured creditors with

11  replacement liens against the Debtor's assets, other than avoidance actions, with such

12  replacement liens to have the same extent, validity, and priority as the pre-petition liens held

13  by such secured creditors were entitled to on the date of the bankruptcy filing, to secure any

14  diminution in the value of their collateral resulting from the Debtor's use of cash collateral.

15  D.    <u>THE PROCEDURAL REQUIREMENTS REGARDING APPROVAL OF THE</u>

16       <u>MOTION HAVE BEEN SATISFIED.</u>

17       Pursuant to Bankruptcy Rule 4001(b)(1)(C), the Debtor is required to serve a copy of

18  the Motion on any entity with an interest in the Debtor's Cash Collateral, any committee

19  appointed or on the twenty largest unsecured creditors if not committee has been appointed,

20  and any other entity that the Court directs.  The Debtor has complied with the foregoing by

21  serving a copy of the Motion by overnight mail to all of the foregoing plus the United States

22  Trustee and those parties who have requested special notice.  The Debtor also served a copy

23  of the Motion by email to PMC's counsel.

24

25              III.

26          <u>CONCLUSION</u>

27       Based on the foregoing, the Debtor submits that approval by this Court of the Motion is

28  in the best interests of the Debtor's estate and respectfully requests that the Court enter an order:

1      (a)    affirming the adequacy of the notice given;

2      (b)    authorizing the Debtor to use cash collateral pursuant to the terms of the Budget

3      and this Motion on an interim basis pending a final hearing on the Motion;

4      (c)    setting a final hearing to consider approval of the Motion on a final basis; and

5      (d)    granting such other and further relief as the Court deems just and proper.

6  Dated: February 3, 2010                    REFRIGERANT EXCHANGE CORP.

7

8      By:  _/s/ Philip A. Gasteier_
           PHILIP A. GASTEIER

9          DAVID B. GOLUBCHIK
           J.P. FRITZ

10         LEVENE, NEALE, BENDER, RANKIN
             & BRILL L.L.P.

11         Proposed Attorneys for Debtor and
           Debtor in Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF DENNIS O'MEARA

I, Dennis O'Meara, hereby declare as follows:

1.      I have personal knowledge of the facts set forth below and, if called to testify, I would and could competently testify thereto.

2.      I am the President and Chief Executive Officer of Refrigerant Exchange Corp., the debtor and debtor in possession in the within Chapter 11 case (the "Debtor"). Accordingly, I am familiar with the Debtor's business, property and books and records. I make this Declaration in support of the Debtor's Emergency Motion for Entry of an Order Authorizing Use of Cash Collateral on an Interim Basis Pending Final Hearing.

3.      The Debtor commenced this bankruptcy case by filing a voluntary petition under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on January 29, 2010. The Debtor is operating its business and managing its financial affairs as debtor in possession.

4.      The Debtor is a leader in providing environmentally responsible solutions for refrigerant reclamation and recycling in the United States. Though incorporated in 1997, through its unique proprietary system it has pioneered the separation and purification of refrigerant material to U.S. Environmental Protection Agency specifications since 1971.

5.      The Debtor operates out of a processing facility located at 5263 N. 4th Street, Irwindale, California 91706, and has maintained an office and small warehouse in a leased facility located at 15709 E. Arrow Highway #4, Irwindale, California 91706. The Debtor has 7 regular employees and 3 part-time employees

6.      The Debtor is an EPA certified refrigerant reclaimer. It accepts used and mixed refrigerant from a variety of sources, separates this mixed refrigerant back to original specifications as required by the EPA to assist in meeting targets for reductions in use of hydrochloroflourocarbons ("HCFCs") set by the Montreal Protocol. (The Montreal Protocol is a successful international treaty first released for signing in 1987, for the purpose of combating loss in the ozone layer protecting the Earth from harmful ultraviolet rays.)

7.      The Debtor's operations were primarily financed by Pacific Mercantile Bank

1

("PMB"), which asserts a first priority security interest in substantially all of the Debtor's assets to secure an obligation of approximately $1.3 million.  PMB's claim is also secured by a first deed of trust on the Debtor's interest in the real property on which its processing facility is located.  That facility is also subject to a second deed of trust securing an amount asserted to be up to $175,000, and a third deed of trust securing an amount of $60,000.  In addition, the Debtor has recently been subject to two filed tax liens, one by the State of California, Franchise Tax Board in the amount of $2,526, and the second by the State of California, Employment Development Department is an undetermined amount believed to be approximately $2,800.

7.    The Debtor's assets, which serve as collateral for the foregoing secured claims, are valued at approximately $3,581,000 based on appraised value of the real estate at $1,250,000, and book value of inventory at $1,443,500; accounts receivable of $227,000; and furnishings fixtures and equipment of $660,550.  However, for reasons discussed below, I believe that the value of the Debtor's inventory and business as a going concern is actually substantially higher.

8.    I believe that, through the Chapter 11 case, the Debtor will be able to address its financial issues and pursue an effective financial restructuring strategy.

9.    A principal part of the Debtor's recent business plan has been to accumulate as much volume in HCFCs as possible, which is primarily "R-22 refrigerant."  R-22 refrigerant is one product of the separation process applied by the Debtor to used material which it receives. As of January 1, 2010 EPA has implemented the mandate of severe restriction of production of new HCFCs, including R-22 refrigerant, as required by the compliance with the Montreal Protocol.  These restrictions are widely expected to significantly increase prices.  In one study the EPA estimates that there will be shortage of 40,000,000 pounds of R-22 in 2010, with increases to possibly 60,000,000 pounds by 2013 due to EPA mandates that manufacturers of new R-22 must reduce their production of R-22 by 5% each year from 2010 until 2014, when it is less than 1% of requirements.

10.    With that in mind, the Debtor has accumulated nearly 2,000,000 pounds of used and mixed R-22 refrigerant.  Prior experience bears out the anticipated price increases.  When a

phase one type refrigerant was cut off earlier in the 1980's the pricing of the CFCs went from $0.50 to $30.00 in one year. The pricing of those CFCs has maintained a high price even until now of about $12 per pound nearly 20 years later. Anticipating a similar situation for the R-22 refrigerants, the Debtor has been accumulating material in order to take advantage of the demand for this material when the production of new R-22 is reduced. The Debtor has already seen the pricing of R-22 go from about $1.00 a pound in late 2008 to nearly $4.00 per pound on a wholesale basis. Manufacturers have scheduled additional increases beginning February 25th to $6.00 per pound, and have already placed all of the current customers on allocation and are restricting the availability of new material. The Debtor feels strongly that the pricing of this material will continue to increase to as much as $10 to $12 per pound by this summer subject to weather and economic conditions in the country. The Debtor has been preparing for this unique "Perfect Storm" of demand and pricing for a long time by purposely keeping sales of this material at a reduced rate while accumulating this material.

11.    In addition, the Debtor has been expanding production capacity to enable it to produce more saleable material from incoming used material. Because the Debtor is in California, the expansion process has been slow and laborious. As the current plant had maxed out its electrical capacity the Debtor started the process of putting in a new 1000 amp electrical panel to allow it to expand overall operation. Because of the heavy regulatory environment of California and Southern California Edison this took over two years to complete. These delays in time and effort are costly to a small firm.

12.    The Debtor was able to obtain better financing, but in that process was left with a second trust deed at high interest. The terrible financing climate of the last 14 months would not allow it to refinance the second trust deed without causing severe economic cost to the firm. The Debtor was unable to obtain the additional financing to pay off the second trust deed. The Debtor was required to seek bankruptcy protection in order to avoid foreclosure on its processing facility by the holder of the second trust deed. It is critical for the Debtor to keep its existing processing facility. It is extremely complicated to replace permits for operations because they

are site specific.  To move to another site would have been extremely costly, time consuming and disruptive to the business.

13.    There is another unique revenue source to the company which is available as of February 3, 2010.  The Climate Action Reserve ("CAR"), an independent organization which verifies and certifies the development of carbon credits for sale to industrial end users needing these credits to expand or establish new industrial plants in the USA, has allowed companies with ODS (Ozone Depleting Substances for which refrigerants are a large source) to destroy them and obtain the ability to have Carbon Credits for sale.

14.    Based on current conditions, if the Debtor, which is member of CAR, incinerates 10,000 pounds a month of CFC type refrigerants under the CAR guidelines it will have nearly 47,500 metric tons a month of carbon credits which to sell.  At the current rate of about $7.00 per ton this would produce an additional source of income of about $300,000 a month.  The Debtor has over 100,000 pounds of CFC types of refrigerant in its inventory which it can incinerate and generate over 475,000 metric tons of carbon credits this year.  This would enhance its income by over $3,000,000 this year alone.

15.    Unfortunately, the Debtor's financial situation did not permit it to maintain all payments until it could fully implement and realize the benefits of its business plan.  However, we are now into the year where the refrigerant will start to take dramatic hikes in pricing, allowing the Debtor to generate a very comfortable cash flow from the business.  Attached hereto as Exhibit A is a Cash Budget for the four months of February through May (the "Budget").  The Debtor's key and most profitable months are usually June, July, and August, where we anticipate doing even better than the first four months.

16.    The Budget reflects the above described revenues sources during the period it covers.   Although amount may vary from period to period based on events, I believe that the Budget fairly reflects projected expenditures during the period.

17.    The Debtor is requesting Court authority to use its cash collateral pursuant to the Budget on an interim basis pending a final hearing, and on a final basis for the period covered by

the Budget, except that the Debtor seeks Court authority to exceed the total budgeted sums (both individually and in the aggregate) by no more than 15%, measured at the termination date, to enable the Debtor to avoid having to rush back into Court if the Debtor's actual expenses exceed budgeted expenses by a negligible amount.  Moreover, if actual expenditures for any line items during a particular period are less than in the operating budget, the difference shall carry over to the following months.

18.    Unless the Debtor is authorized to use its cash collateral on an emergency basis, the Debtor will be unable to pay necessary expenses of operation including but not limited to $7500 which must be paid by February 5, 2010, and other necessary expenses as shown in the Budget.  If the Debtor is unable to pay such expenses in timely manner it may suffer damage to its customer, supplier and employee relations and resultant irreparable harm to its business.

19.    In recognition of the difficulties inherent in the first months of operation under Chapter 11, the Debtor has attempted wherever possible in the projection included in the Budget to defer non-critical expenses during the first 45 days.  The projected expenditures which remain are those necessary to avoid disruption to the operations and business of the Debtor and thus to avoid possibly irreparable harm to the value of the Debtor's property and business.  Some of the expenditures need to be made almost immediately on an ongoing basis to insure continuation of normal operations. As discussed above, the Debtor is unable to obtain the necessary funding from another source.  In light of the need to obtain approval of use of cash collateral, it is critical that a hearing on use of cash collateral be scheduled for a date on or before February 5, 2010.

20.    The Budget also projects continued levels of cash, receivables, inventory and furnishings and equipment during the covered period.  These are based on the sales and expense projections contained in the Budget and assumptions as to Carbon Credit sales as discussed above.  It is apparent that all secured creditors asserting an interest in cash collateral will maintain a substantial equity cushion throughout the period.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __ day of February 2010, at Irwindale, California.

_____

Dennis R. O'Meara, Declarant

# EXHIBIT A

Refrigerant Exchange Corp
Cash Collateral Budget

| | 2010 | | | | | | |
| | 2/1-2/7 | 2/8 - 2/14 | 2/15-2/21 | 2/22-2/28 | March | April | May |
|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | |
| Sales | 7500 | 79,000 | 6,500 | 6,500 | 120,000 | 55,000 | 65,000 |
| Other ( Carbon Credits) | | | | | 250,000 | 200000 | 200000 |
| Total | 7500 | 79000 | 6500 | 6500 | 370000 | 255000 | 265000 |
| | | | | | | | |
| **Expenses** | | | | | | | |
| Real Property Leases | | 8000 | 8000 | | 8000 | 8000 | 8000 |
| Equipment Leases | | 2650 | | | 2650 | 2650 | 2650 |
| Payroll | 1500 | 10000 | 1500 | 1500 | 22250 | 22250 | 22250 |
| DRO/Meara | | | 2000 | | 4000 | 4000 | 4000 |
| Utilities | | | | | | | |
| Socal Gas | | 2000 | 4000 | | 2000 | 2000 | 2000 |
| Telephone | | 650 | 1950 | | 650 | 650 | 650 |
| Socal Edison | | 4500 | 9000 | | 4500 | 4500 | 4500 |
| Taxes | | 4400 | | | 4400 | 4400 | 4400 |
| Purchase of Refrigerants | | 20000 | | | 20000 | 20000 | 20000 |
| Repairs and mainentance | | 2800 | 2500 | 2500 | 5000 | 5000 | 5000 |
| Miscellaneous Expenses | | 3500 | 500 | 500 | 3500 | 3500 | 3500 |
| Incineration Expenses | 500 | | | | 25000 | 25000 | 25000 |
| Total | 2000 | 58500 | 29450 | 4500 | 101950 | 101950 | 101950 |
| | | | | | | | |
| Cash accrued | 5500 | 26000 | 3050 | 5050 | 273100 | 426150 | 589200 |
| Accounts Receivable | 227500 | 201500 | 148500 | 148500 | 28,500 | 28500 | 28500 |
| FF&E | 660500 | 660500 | 660500 | 660500 | 660500 | 660500 | 660500 |
| Inventory | 1,443,500 | 1,423,500 | 1,422,500 | 1,421,500 | 1,390,000 | 1,380,000 | 1,370,000 |
| | | | | | | | |
| Total | 2,337,000 | 2,311,500 | 2,234,550 | 2,235,550 | 2,352,100 | 2,495,150 | 2,648,200 |